Case No. 15-1489 Sierra Club Petitioner v. United States Department of Energy Mr. Matthews for the petitioner, Mr. Smeltzer for the respondent, and Mr. Franklin for the intervenors Mr. Matthews, good morning. Good morning, Your Honor. Nathan Matthews on behalf of Sierra Club. I'd like to say five minutes for rebuttal. You're a long way from home. Yes. As explained in our briefs, DOE's action was unlawful in several regards. Today I'd like to focus on two points related to DOE's NEPA obligation to examine gas production. DOE's orders are premised on the belief that the authorized liquefied natural gas exports will cause an increase in U.S. gas production. However, my first point is that DOE agrees that it did not identify or characterize the environmental impacts of that additional gas production. By failing to do so, DOE failed to take a hard look at those impacts. My second point is that the record demonstrates that DOE had the tools to foresee what those impacts would be. On that first point, although DOE admits that export-induced gas production may have significant impacts, for example, the Department states that increased gas production may cause increases in regional ozone pollution. But beyond that bare admission, DOE, in its own words, did not identify or characterize those impacts. So with regard to ozone, DOE provided no discussion of how many regions would suffer increased ozone, where those regions might be, how large the increases would be, or how often those increases would cause a violation of EPA's air quality standards. While DOE has discretion in choosing the method it uses for how to answer those questions, DOE can't decide simply not to answer those questions in the first place. NEPA's most basic command is that the agency shall sharply define the consequences of the authorized action to provide a clear basis for approving or rejecting a proposal. There is no case that has condoned an agency decision to simply acknowledge the possibility of a conceitedly significant impact, but to then stop without providing any further evaluation of the scale or severity of that impact. Turning to my second point, the record demonstrates that DOE had the tools to provide that missing evaluation. The primary source of uncertainty that DOE identifies as uncertainty is the volume of future exports, but in its brief, DOE admits that cumulative exports of 3.5 trillion cubic feet per year are foreseeable for purposes of NEPA. Available modeling tools can predict how that level of exports would increase gas production in individual gas plays. Nowhere in the record did DOE dispute that the Energy Information Administration's models could provide a play-level forecast of increased gas production, nor can DOE argue that that EIA model is unreliable because that's the same model DOE used to assess the economic impacts of exports. The only time DOE responded in the record to our suggestion to use that model to address play-level impacts was in the denial of our request for a hearing, and the argument DOE gave there was not that play-level predictions were unavailable, but that they would not be useful because they were, quote, insufficiently specific to support an analysis of environmental impacts. But then in discussing ozone, the Department's sole argument for not modeling ozone impacts is to claim that DOE couldn't do so without having a play-level production estimate. So this is quintessential arbitrary reasoning. The Department contends that the pieces it has won't fit together, but when we pressed for specifics, they identified a square peg in a square hole. To put this all in context, the gas play closest to the Freeport Terminal is the Haynesville Shale. The Department explained that the Haynesville is one of the four largest shale gas plays. Freeport's application identifies the Haynesville Shale as a likely source of gas to be exported, and their record demonstrates that both EIA and private modelers have the tools to predict how various levels of exports would increase gas production in the Haynesville Shale specifically. The record also contains a peer-reviewed study, which DOE summarized without any criticism, which modeled how changing levels of gas production in the Haynesville Shale would affect ozone levels in Dallas, in Austin, in Baton Rouge, and other neighboring regions. Can I ask you about our decision in Sierra Club versus FERC, which came out, I think, after you all briefed this. Yes. And how much of that, that deals with the approval by FERC of the Terminal. How much of that decision ties our hand? It does essentially none of it. A lot of it said that's being considered in this case. Yeah, I mean, the panel in that decision explicitly stated that nothing in that opinion was any barrier to our ability to bring the same challenges against the Department of Energy. Instead, the panel recognized or concluded that the claims we had in that case would be better brought before the Department of Energy. But how about the discussion of the cumulative and indirect effects? The discussion of whether those indirect effects were foreseeable in that case all depended on the preliminary holding that authorization of exports was the Department of Energy's problem. So that opinion regarding the FERC authorization didn't conclude, for example, that effects of exports on gas production were unforeseeable. It just held that every causal chain linking exports with gas production had as an intermediate step the Department of Energy's approval of exports. And so it said there was no foreseeable way in which FERC's authorization of infrastructure would have those indirect effects that wasn't interrupted by the Department of Energy approval, which the Court instructed us to pursue in this present case. And those effects were limited to the region of the Terminal. Was that right? The effects it discussed? The effects that FERC discussed? Yeah. The FERC environmental impact statement, which was at issue in that case and which the Department of Energy adopted in these orders, provided no analysis of indirect effects related to gas production or anything other than effects at the Terminal site itself. The environmental impact statement concluded that those are outside the scope of need for review. Okay. But the record demonstrates that the Department of Energy clearly had the ability to analyze the impact of export-induced gas production, certainly in the Haynesville Shale, but there's also nothing in the record to suggest that DOE could not perform a similar analysis regarding additional gas production that may be induced in any other gas place as well. And the ability to foresee impacts in a quantitative way, or at least to provide some discussion of the scale of severity, extends beyond ozone. The Department also failed to identify the effect of natural gas exports on U.S. greenhouse gas emissions. The environmental addendum that the Department admitted that any uncertainties to where gas production would occur was no barrier for greenhouse gas emissions because the effects of those emissions are not local. Sagiera Club repeatedly in the record commented that the Department of Energy needed to identify the net impact of exports, either for individual projects or cumulatively, on United States greenhouse gas emissions, and that that U.S. emission total is important because the U.S. has adopted both emission reduction targets and reporting obligations that specify the need to look at territorial emissions. So Sagiera Club has never contended that potentially offsetting reductions in emissions that would occur overbroad as a result of O&G exports were irrelevant, but that's a reason to discuss both the domestic emissions increase and the potential offsets, not to just assume that it's a wash and fail to take a hard look at either. A central issue in this case is that the Department, in the record and in its brief, argues that effects are uncertain, but uncertainty is not the same thing as unforeseeability. This court has recognized that NEPA requires reasonable forecasting and speculation. All forecasts will inherently have an element of uncertainty in them, and the Department has demonstrated that it has the tools to deal with uncertainty and provide reasonable forecasts despite that. To take, again, one of the two central sources of uncertainty identified by the Department, which is uncertainty over what level of natural gas exports will actually occur, the economic studies that inform the Department's price impacts provide a clear example, is that the Department can assume different levels of exports, whether they think they are likely or at least potential, and say we don't know whether there's going to be 3 trillion or 4 trillion billion cubic feet of exports per year, but we can say if it's 3 trillion, this is what the impacts are going to look like, and if it's 4 trillion, this is what the impacts are going to look like, and that that analysis of the spectrum of potential impacts provides the important analysis that NEPA requires. Another way of handling uncertainty is illustrated by, again, the National Energy Technology Laboratory report on global greenhouse gas emissions. We contend that that report is not a substitute for NEPA review, but one thing that that report gets right is it acknowledges that the amount of greenhouse gases emitted per unit of gas production is uncertain, so it provides estimates with error bars. It says we don't know exactly what it's going to be, but it's somewhere in this range, and so there are a couple of different ways in which the Department of Energy could have predicted impacts despite or provided reasonable forecasts despite the sources of uncertainty that they identify. The Department's willingness to use those scenario analyses and other tools for economic impacts, but not to use those same tools for assessing environmental impacts violated NEPA. I see that I'm into my time for rebuttal, so there are no questions. All right. Thank you. Mr. Smeltzer. Good morning, Your Honors. May it please the Court, John Smeltzer for the Department of Energy. Your Honors, DOE took a hard look at the environmental impacts of authorizing LNG exports from the Freeport Terminal to the extent such impacts are reasonably foreseeable and can be meaningfully evaluated. NEPA and Section 3 of the National Gas Act require nothing more, so the petition for review should be denied. Let me start with the question of induced natural gas production. The impacts there, what we're talking about in terms of the environmental impacts, are the impacts from drilling and producing from wells. And as the DOE explained in the environmental addendum, those are localized impacts that impact the particular streams or particular air quality attainment areas in particular parts of the country. The causal connection between allowing exports and drilling in any particular area in relation to any particular air quality control district is highly attenuated. DOE is not leasing... Is there any modeling available to at least lend further information on this issue? There are models that DOE has used to determine the levels of production that might occur as a result of certain export levels on a national level and on a play level. Plays are geographic formations that don't correspond specifically to air quality control regions. The Marcellus Shale, for example, one of the largest and most significant covers areas from Kentucky all along the Appalachian all the way up to New York. So if there was a model that told you there was going to be increased production, for example, out of the Marcellus Shale, it wouldn't tell you where that production occurs or would occur. Where are the wells actually going to be drilled within that expansive geographic area? And that's generally true for all of natural gas producing areas. So what DOE explained is the model that's available that can help determine at a play level what production levels would be still wouldn't tell you where the wells are, and it wouldn't allow you to determine with respect to any particular air quality control region, for example, what the impacts would be on that air quality control region. Well, this is an application from the whatever, Kintana Island, Texas terminal, right? Yes. So wouldn't the terminal know where the gas was coming from? I mean, where it was being drilled or does it just open its doors? Well, as DOE explained, there is the natural gas system in the lower 48 states is highly integrated. There's an integrated pipeline system, and the shale plays and the tight gas plays and the other sources of natural gas are scattered all across the United States, and gas is fungible. And none of the contracts at issue with respect to the construction of the Freeport Terminal and the authorization require Freeport to source its gas from any particular place. And even if it were place-oriented, the causal connection here is a causal connection that's being postulated through market dynamics and the notion that there will be an increase in the demand for natural gas, which will then manifest itself throughout the country in some regions being produced that wouldn't otherwise have been produced without that increased demand. And so the causal connection that's at issue here isn't nobody saying that the export from Freeport is going to cause natural gas to be produced in any particular place. What DOE has said is that there's a possibility that it may accelerate domestic national gas production generally. And what DOE has further said is that just knowing that won't tell you where specifically that production is going to occur, and therefore because of the attenuated nature, attenuated on two levels, first an inability to specifically determine what levels of demand there will be, what will be the aggregate export demand, very difficult to determine because it depends on all sorts of questions that can't be forecast, political conditions, technological conditions, regulatory changes. And these are conditions that when you're dealing with exports, you're talking about international, not only domestic conditions that may impact what the level of export demand will be. So you start with, and yes, DOE in its 2014 annual energy outlook projected that there would be 3,500 billion cubic feet per year in the year 2029 through 2040 in exports. That's a projection that they made based on current conditions, but they also explained that, look, this is a highly uncertain projection. And then DOE further explained, look, you start with this highly uncertain projection on demand, and then you try to determine, well, what does that tell you about where the gas is going to be produced in the United States? And as we just discussed, that demand impact isn't going to show you where those wells are going to be sunk. It can't be modeled. It just seems to me that NEPA, with respect to your NEPA analysis anyway, with respect to the exportation of natural gas is almost a dead letter. I don't know. Can you give me an example of an application where you have been able to assess quantitatively? And that's another question I have, the difference between your emphasis on qualitative analysis and quantitative, where you've been able to make that analysis and say, yes, these will be the effects, no, these will not be the effects. Well, the certain site-specific effects, the effects on Quintana Island and the effects in surrounding Brazoria County from the construction of the export facilities and from the operation of the export facilities are reasonably foreseeable and have been identified in the EIS that was prepared by FERC with DOE's cooperation, and the same thing has happened in other cases. What we have said is beyond those localized effects that are reasonably foreseeable, you can foresee that there will be an impact on production. And because of that, DOE went to great lengths and produced an environmental addendum that comprehensively set out what all those impacts might be with respect to air, water, seismicity, greenhouse gas emissions. There's not a single potential environmental issue that Sierra Club has identified that DOE did not consider in its environmental addendum. What DOE decided that it could not meaningfully do was determine what the specific impact would be on an air quality control region because DOE cannot meaningfully predict where those wells are going to be drilled and what natural gas fields are going to be developed. So is that something that is going to apply with every application? I would imagine yes, to the extent that these applications are the same in that way, that localized impacts can be focused on, and then otherwise the broader aggregate impacts on demand and on production will be the specific impacts from that will not be reasonably foreseeable in most circumstances. Will there come a time when you've looked at so many terminals that you'll be able to say what the cumulative effect is? Not just the regional or the localized, but the national or cumulative effect? What DOE said in this case is the cumulative effect is foreseeable to the extent that they know the nature of the impacts. They can evaluate that. That's the qualitative. Is that right? Qualitative analysis, sure. But what determines the actual production is going to be what the market demands and not the specific level that's authorized. You seem to be asserting, if I understand you correctly, that when you cannot determine a specific air quality control region, that's the end of the inquiry. We can't tell which air quality control region. Is it not possible to do some sort of air quality analysis in some other basis rather than following the defined region? Well, what Sea Air Club has asked for specifically in this case is by air quality control region. They say we can do that. The study they point to with respect to the Haynesville shale was a study where the authors of that study just took for granted that there would be certain levels of production. They modeled it out and then said, well, look, if that happens, this might happen in particular air quality control regions. And that's in the addendum and that's described. And the question is, can anything more meaningful than that be provided at this stage of the inquiry? And what that study shows is that, yes, if lots of the shale plates are fully developed, there will be or potentially could be impacts on particular air quality control regions. And DOE says that would need to be monitored. But what DOE also says is at this stage of the game, when we're just authorizing exports and we can't predict what the demand is going to be and where that gas is going to be produced, it's not meaningful for our decision-making right now, the decision which is just an up or down decision on whether exports should be allowed, to think that we are going to control, we are going to cause air quality problems in Pittsburgh or Houston. Because that's just too attenuated to say that by approving an export application for 146 billion cubic feet per day of natural gas, which is a small fraction of overall production, whether there's exports or not, that you're going to have a particular air quality control impact in some particular region in the country. Does that imply that there is a stage at which you will be able to assess those effects? There is a stage when those impacts can be looked at, not necessarily by DOE in the export authorization process. But DOE is by no means the only actor. These things are regulated by state and the federal government in different ways. But isn't there, I guess, how are we as a court reviewing this, supposed to know kind of like when we've crossed the line from not really knowing the extent of the impact versus not knowing, not being able to describe the nature of the impact? Because, I mean, just to use, I guess, an absurd example, I mean, what if FERC had approved an LNG plant that would export a trillion cubic feet per year of liquefied natural gas? Are we to say that, you know, we can't, your hands would be tied, you couldn't really assess what the impact would be if that went online either? Well, I think what the answer would be is if it's not really what has been authorized, I mean, let me back up, what has been authorized in this case is at a level that presumably can be met, right? If FERC or DOE was to authorize at some level that is way beyond what any market projection has shown, you know, again, there would be no causal relationship between the authorization that provides something that is not foreseeable, right? I mean, it's a tough hypothetical because it wouldn't happen, but what matters in that context is what you can project as being potentially foreseeable from the particular authorization. And what DOE has said is with respect to this particular application and others, that it can foresee that there will be production impacts and it has provided to the best of its ability a comprehensive evaluation of what those impacts would be. It only stops short in trying to put precise numbers on, you know, where the impacts would be in particular resources around the country because it's just too attenuating to decide. Well, I guess this is similar to Judge Henderson's question earlier, which was it's kind of like death by a thousand cuts or something. You know, the Sierra Club is saying that, you know, you keep approving all of these facilities, and so there's a lot of capacity there, and if all of that capacity is used or even if some significant amount of it is used, there's going to be some impact. But because we say, well, we don't know how much of those facilities are actually really and how many, you know, are going to come online. You know, there's lots of applications and licenses that are granted if facilities don't get built. And we don't know, you know, there's so many things that we don't know that we just, even though we're approving all of this, we're just going to say, you know, we can't really tell what the impact is and that there's something that seems wrong with that. I understand their argument, and what they focused on in this case is the projection in the 2014 annual energy outlook, which says 3,500 billion cubic feet per year. And that is a projection that doesn't tie to this particular authorization. The authorization here was for 146 billion cubic feet per year, not 3,500. But what we've explained is that the 3,500, even if you accept that number, is still a small percentage of overall production, and that the overall production figures are also presented in the addendum. And I think the projected 2040 overall domestic production was around 37,000 billion cubic feet. And so the numbers are there in terms of the generics of the potential cumulative impacts. DOE has only stopped short in trying to predict at this stage, given that we're talking about long-term projections that are just very hard to provide really reliable information. And the play-level modeling that can tell you maybe where some production will occur by play still won't get you that fine enough look to be able to say, is this going to be a problem in a particular area? What DOE explained is the export control decision is a blunt instrument with respect to trying to control emissions that will occur down the line through the very attenuated chain of causation with lots of other actors involved. And we submit, given the basis of their decision and the inability to reasonably foresee specific impacts, it was perfectly reasonable to stop with the analysis where they did. Can I ask you before you sit down about Sierra Club versus FERC? Yes. Does it tie, do you think it ties our hands in any way? It does with respect, if there were any challenge to the FEIS as being, but Sierra Club in this case is not really bringing those challenges. So no, you're on. Okay. All right. Thank you. Mr. Franklin. Thank you, Your Honor. May it please the Court, Jonathan Franklin for the Freeport Interveners. I'd like to start, Judge Henderson, with addressing a few of your questions. First of all, Freeport does not know where the gas is coming from. We get it from shippers. It's tied into the interstate natural gas pipeline system. It can literally come from anywhere, and that is what, in fact, the OE found was contributing in large measure to their inability to find reasonable foreseeability in this case. I would also say that, just to follow up on the last question, while maybe the FERC case is not tied to the Court's hands, we do think that it is very relevant, at least on the cumulative impacts part of the decision. In that case, the Court relied on, among other things, the language in Kleppe and other precedents that talk about the cumulative impact being in the same geographic region, and while the Court did say we're not tying your hands in this case, I think that same analysis would apply to this case as well. And that, in fact, goes to another point that Your Honor made, and that is whether NEPA would be a dead letter. No, it would not be. There was a more than 300-page environmental impact statement prepared here at great cost, at great length, with a lot of analysis that went into it. There were more than 70 environmental conditions that my clients have to abide by in connection with this authorization. The DOE looked at reasonably foreseeable environmental impacts in that more than 300-page EIS, which was done by FERC, but with DOE as a cooperating agency. But they properly and reasonably declined to engage in speculation that really would not meaningfully affect their analysis, and that's important here. The question is not can we put together a bunch of models, and as my friend here was saying, just try this scenario, try this one, try this one, try this one. Ultimately, even if you ran all that through your models, you're not going to come up with meaningful information. And just to take the localized impacts here, we're talking about, in this case, not any direct impacts, not even really first-level indirect impacts. We're talking about price impacts. So they're saying because we're going to be exporting a volume of gas, that is going to increase demand, that that will have some effect on prices over the next 20 years, and that effect on prices will in turn have an effect on production. That effect on production will then in turn have a substitution effect on other users. And what DOE said is, look, because of this lengthy and theoretical chain of causation that Sierra Club posits, we have concluded that we really wouldn't derive any meaningful information out of that analysis. We did a very, very thorough analysis on everything that we could, in fact, reasonably predict, but have reasonable foreseeability on, but we are not going to go that next step and try to quantify things that are inherently unquantified. In addition to not knowing when the gas is going to be produced, where it's going to be produced, and how many quantities it's going to be produced, there are numerous other drivers of gas prices and gas production, including the overall economy, future regulatory changes, future technological changes, and we're talking about projections or predictions over a 25-year period. And I'm just going to give you an example here, and this is just an example. It's not from the record of this case, but DOE, and you can see the site at footnote 5 of DOE's brief, every year they come up with a projection that goes out 25 years. What's the energy market going to look like? And they use the same modeling system that Sierra Club is asking. And just out of curiosity, I went back and I looked at the 2005 projection, and they were projecting in 2005, 10 years later, in 2015, there would be 7 trillion cubic feet of net imports of natural gas, including 4.33 trillion imports of natural gas. If you look at the 2016 projection, the actual imports of natural gas, zero, or close to zero. And that goes to this whole why we're here, and that is my clients built this terminal thinking that it was going to be an import terminal, back when everybody was saying imports were going to be the thing. And it's not that we weren't doing our best. It's not that DOE isn't doing its best. It's just these things are inherently impossible to project. You can't know. If somebody tells you, I know what natural gas prices are going to be 15 years from now, and by the way, the linchpin of this entire analysis is natural gas prices, because all of the effects that Sierra Club is positing here come from the price impacts of this demand. And if somebody says, I can tell you what that's going to be, they're lying to you. They can't. And they can put a model together and they can do a projection, but I think DOE was very careful to say that its modeling does not establish reasonable foreseeability. They used that modeling in a different capacity. They used it primarily for their public interest determination. And what they found, and this also goes to what Sierra Club is arguing here, Sierra Club's essential argument has been in this case and all of the other cases, that in their view, DOE should not allow any exports of natural gas anywhere at any time. Now, what DOE determined, looking at all of this qualitatively and looking at all of the other environmental impacts, is that we think, yeah, there might be some effects somewhere. We can't tell you what they're going to be because those are not reasonably foreseeable. But what we have determined is that the public interest will be better served by allowing the state and federal and, in some cases, international agencies that regulate those effects directly to do their job, rather than by using the blunt instrument of an export ban. Now, that's their public interest determination that was made according to the powers delegated to them in the Natural Gas Act, and I think that that is a reasonable determination. And if Sierra Club still believes that exports should not be allowed, notwithstanding the presumption that Congress has established in the statute that they are in the public interest, then they need to take that case to Congress. NEPA required DOE to evaluate reasonably foreseeable environmental impacts and to take a hard look at them. And DOE did that in a more than 300-page EIS that they worked on with FERC. But what they declined to do is to go further and speculate on things that would not meaningfully affect their decision. Now, that determination is entitled to deference under both NEPA and the NGA, and we think that according to the deference that it's due, the decisions should be upheld. All right. I may have mischaracterized it as a dead letter. I think I would characterize it as an exercise in futility almost, a 300-page report taking many, many years, and the end result is we can't give you an answer. I understand. I mean, I understand all the reasons that's so, but I'm just making that comment. And it's a fair point, Your Honor, and I don't want to make light of it. I think what I was saying, though, is that we can't tell you this because this is just beyond what we can do. But the people around this facility are indeed protected by the fact that an environmental impact statement was done, and it was done in a way that all of the other environmental impact statements or most of the ones that this Court sees are done. We're talking about going further and saying we're not talking about the effect in this region or even nearby. We're talking about, say, an effect in North Dakota based on an authorization in Texas, and that is a price impact. And I don't think there's any case anywhere that has ever gone that far in saying that kind of thing is reasonably foreseeable, particularly when an agency has said we just can't do it. All right. I do have one question. Oh, yes. Is liquefaction done for any reason other than transport? I don't believe it is, Your Honor. I mean, that's a big enough reason, but you don't use liquefied natural gas. No, it has to be liquefied and then turned back into a gas. And it's done that way for export so that it can actually, the volume, I don't know that the people know the numbers, the volume shrinks dramatically when you liquefy it. And that's what, if you've ever seen the ships, they have these big balls that they carry them in, and that's how you get them on ships. Okay. Thank you. Thank you. Does Mr. Matthews have any time left? Okay. You don't have to use them all. So I'd just like to make a couple points and in particular clarify the record. First is that liquefied natural gas exports and foreseeable levels of exports will fundamentally change the U.S. energy market. The 3.5 trillion cubic feet per year of exports that DOE concedes is foreseeable is at least 10% of U.S. gas production. And you can't take that gas out of the U.S. market without that gas coming from somewhere. The effect of exports on increasing gas production is not just incidental to the exports authorized here or to cumulatively proposed exports. Freeport's application states that the major source of purported economic benefit from the proposed exports is going to be the economic activity created with the extra gas production that would result from the proposed exports here. So there is nothing in the record to suggest that there is any doubt that exports will increase gas production, and that is central to both Freeport's application. It's also central to the Department of Energy's conclusion that exports will not adversely affect U.S. gas supply or gas prices. DOE has a Natural Gas Act obligation to consider the effect on gas prices and supply before authorizing exports. DOE concluded that there would not be an adverse effect here because gas markets would respond by increasing production in response to exports. This court's holding under Scientist Institute for Public Information states that if that forecast of increased gas production is good enough for DOE's economic analysis, DOE can't turn around and say, yeah, but it's too uncertain to use for the environmental analysis. What's good for the goose is good for the gander there. I'd also like to point out that the record contradicts the Department of Energy's statement that they cannot predict where, at least at the gas play level, the exports will occur. I don't know if you have the records of record in front of you, but if you look at Joint Appendix page 476, that is a report by a private consultant, Deloitte Market Point, considering the impact of an individual liquefied natural gas export proposal. It provides quantitative estimates of how gas production would increase in a number of gas plays, including the Haynesville Shale, which is the play closest to the terminal. There's no suggestion in the record that either that particular forecast is unreliable or that the EIA's modeling tools can't prepare a similar forecast. The EIA described its model as a play-level model, and again, in the record, DOE never claimed that the EIA tools can't provide play-level estimates of increased production. DOE instead claimed, without support, that those play-level estimates would not be useful. Another circumstance in which the department has mischaracterized the record or where the record does not support the department's position is the claim that they can't go from a play-level production forecast to an analysis of environmental impacts because either they don't know where within a play gas production will occur or the play is not contiguous with air quality regions. But the Kimball-Cook study, which the department summarized, again, without criticism in the addendum, said all we need to know is how much production will increase in the Hainesville Shale, say 5% or 10%, and we can predict how that will impact air quality in Dallas, Austin, Baton Rouge, etc. So the only time that the department actually discussed what an available model could do, it endorsed the model's prediction of providing the kind of analysis we think the department was required to do here. And then finally, on the FERC case and its discussion of cumulative impacts, I think there's a confusion of the cart and the horse there. In the FERC case, the court concluded that because FERC was not required to consider indirect effects of gas production, then the FERC did not need to consider the cumulative impact of other export facilities. I see that my time is up, but... Well, finish your sentence. So the court said that because there were no foreseeable indirect effects within FERC's purview of that particular facility that spans, say, the Hainesville Shale play, then FERC didn't need to consider the cumulative effect of other export terminals that would also affect production in the Hainesville Shale play. But for the Department of Energy, where the indirect effects of an individual project do reach out that far, then that broader geographic unit also determines the scope of the cumulative effects analysis. Perfect. There are no further questions?  Thank you, Your Honor.
judges: Henderson, Wilkins, Sentelle